| **UNITED STATES DISTRICT COURT** | **EASTERN DISTRICT OF TEXAS** |

| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CASE NO. 1:01-CR-31 |
| | § | |
| JOSEPH FRANKLIN SMITH | § | |

### MEMORANDUM AND ORDER

Pending before the court is Defendant Joseph Franklin Smith's ("Smith") Motion for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A) (#248). Smith contends that a sentence reduction to time served is warranted in this case because he received an unusually long sentence in comparison to what he would receive today for the same conduct, he has displayed remarkable rehabilitation, he was young at the time of his offenses, and there are unwarranted disparities between his sentence and those of his co-defendants.

The Government filed a Response in Opposition (#259), Smith filed a Reply (#260), and the Government filed a Notice of New Authority (#263). After conducting an investigation, United States Probation and Pretrial Services ("Probation") recommends denying the Motion. Having considered the Motion, the Government's Response, Smith's Reply, the Government's Notice of New Authority, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.    Background

On February 8, 2001, a federal grand jury in the Eastern District of Texas, Beaumont Division, returned a five-count Indictment against Smith, charging him in Count I with Conspiracy to Commit Robbery, in violation of 18 U.S.C. §§ 1951 and 371; in Count II with Robbery, in violation of 18 U.S.C. §§ 1951 and 2; in Count III with Use of a Firearm to Commit Robbery,

in violation of 18 U.S.C. § 924(c)(1); in Count IV with Carjacking, in violation of 18 U.S.C. § 2119; and in Count V with Use of a Firearm to Commit Carjacking, in violation of 18 U.S.C. § 924(c)(1). Co-defendants Derrick Ardoin Wright ("Wright") and Korey Jawain Jackson ("Jackson") were also charged in Counts I, II, and III of the Indictment. Counts IV and V of the Indictment, in which Smith was the sole defendant, were severed for trial.

On August 21, 2001, Wright pleaded guilty to Count II of the Indictment. On August 31, 2001, following a five-day jury trial before United States District Judge Richard Schell, Smith and Jackson were found guilty of Counts I, II, and III of the Indictment. On November 26, 2001, Smith pleaded guilty to Count V of the Indictment pursuant to a written plea agreement. On April 19, 2002, Judge Schell sentenced Smith to a total term of 461 months' imprisonment. The sentence consisted of 41 months on Counts I and II of the Indictment, to be served concurrently with each other, 120 months on Count III of the Indictment, to be served consecutively to Counts I, II, and V, and 300 months on Count V of the Indictment, to be served consecutively to Counts I, II, and III. Count IV was dismissed on the motion of the United States. Judge Schell also imposed a total term of 5 years of supervised release, which consisted of terms of 3 years as to Counts I and II and 5 years as to Counts III and V of the Indictment, all such terms to run concurrently.

On April 19, 2002, Judge Schell sentenced Wright to 36 months' imprisonment as to Count II of the Indictment, and Counts I and III of the Indictment were dismissed on the motion of the United States. Judge Schell also imposed a term of 3 years of supervised release. On April 19, 2002, Judge Schell sentenced Jackson to a total term of 156 months' imprisonment which consisted of 36 months on Counts I and Count II of the Indictment, to be served concurrently with each

other and consecutively to Count III, and 120 months on Count III of the Indictment, to be served consecutively to Counts I and II.  Judge Schell also imposed a total term of 5 years of supervised release, which consisted of terms of 3 years as to Counts I and II and 5 years as to Count III of the Indictment, all such terms to be served concurrently.  Jackson's sentence was subsequently reduced to 104 months' imprisonment on July 12, 2008.

Smith appealed his conviction and sentence on April 26, 2002 (#131), which appeal was dismissed for want of prosecution on June 19, 2002 (#141).  He filed an additional Notice of Appeal seeking to reinstate his appeal (#156) on January 6, 2004.  It was dismissed on January 3, 2005, pursuant to the Government's Motion (#165).  Smith filed four Motions to Vacate, Set Aside or Correct Sentence pursuant to 18 U.S.C. § 2255, all of which were dismissed, including a dismissal with prejudice on January 31, 2020 (#242).  Smith also filed eight motions seeking relief from his Judgment pursuant to FED. R. CIV. P. 60(b), all of which were denied.   In addition, he filed three Motions to Dismiss pursuant to FED. R. CRIM. P. 12(b)(2), which were likewise denied.

Smith is currently housed at Federal Medical Center Fort Worth ("FMC Fort Worth"), an administrative security federal medical center with a detention center located in Fort Worth, Texas.  He has a projected release date of March 28, 2034.

II.    Nature and Circumstances of Offenses

According to information contained in Smith's Presentence Investigation Report ("PSR"), on January 2, 2001, the Police Department in Kirbyville, Texas, received a call from Jenny's Fried Chicken Restaurant ("JFC") reporting that the restaurant had just been robbed by two individuals.  Officers were dispatched to the scene.  After the robbery, one of the robbers fired

three gunshots at three of the employees. When the police arrived, several of the workers advised that after the shots were fired, one of the assailants had jumped into a pond and was still there. The police went to the pond and pulled out the assailant, who was identified as Wright. The police recovered $200 from Wright. He was taken into custody while the investigation of the robbery ensued.

Investigators interviewed Laura Dennis ("Dennis"), a worker at JFC. She stated that two individuals entered the restaurant and approached the counter. One of the robbers, who was wearing a blue jacket with a hood pulled down over his face, was later identified as Smith. The other robber, who was wearing a wind jacket with black and blue stripes, was later identified as Wright. Dennis recognized Wright as someone she had seen numerous times. When she asked for their order, the individual wearing the hooded jacket (Smith) pointed a silver and black gun at her and demanded the money. Dennis opened the register, and the robbers began taking money from it. Smith demanded that Dennis give JFC's safe to him. Although Dennis told Smith that there was no safe, Smith yelled at her and demanded it again. Dennis reached underneath the counter and handed JFC's cash box to them. Wright grabbed the cash box, and both Smith and Wright left the restaurant. JFC's manager advised that based on their cash receipts for the day, JFC had taken in $1,300 prior to the robbery.

Three JFC workers followed the robbers outside and saw them running down Lester Hawthorne Road. Smith turned and fired three shots toward the three employees. Wright dove into a pond near the road and was later removed by the police. Smith ran in another direction and entered an Avis rental car before it drove off. It was subsequently determined that Jackson was driving the Avis rental car and his responsibility in the robbery was that of a "getaway" driver.

Witnesses to the robbery told police that there was a suspicious individual sitting in an Avis rental car outside of JFC. One of the witnesses, Benny Shelby ("Shelby"), told the police that he believed Jackson was the person in the rental car. Shelby advised the police that a Ms. Janet Jackson ("Ms. Jackson") had rented the car for Jackson. Shelby asked the Kirbyville police if they would allow him and Ms. Jackson to find Jackson and bring him to the station. The police agreed. Ms. Jackson located Jackson in Beaumont, Texas. The Beaumont Police Department and the Texas Department of Public Safety Narcotics Division ("DPS") were already looking for Jackson due to his passing a forged prescription on that date. The DPS had received a call that two individuals in an Avis rental car had passed a forged prescription at a Walgreens pharmacy in Beaumont for codeine syrup that was written for K. Jackson. The police arrested Jackson at the Jefferson County Airport where he had rented the car from Avis. No one else was in the car with Jackson.

On the same day, the police received a call from a Beaumont convenience store that a man fitting the description of Smith had just stolen a car from a customer at gunpoint. The customer was a salesman employed by a local Dodge dealership. The vehicle taken was a 2001 Dodge Durango valued at $27,250. The Dodge was later recovered in Houston.

The police interviewed Wright, who stated that he, Jackson, and Smith were all living in Houston prior to the robbery, but he and Jackson were both from Kirbyville. According to Wright, on the morning of the robbery, he, Jackson, and Smith were riding around in Jackson's Avis rental car. Wright stated that they all traveled to Beaumont for Jackson to pass some of his fake prescriptions. Wright contended that Jackson obtained forged prescriptions for items like codeine syrup, Xanax, and other pills in order to sell them for profit. As they left Beaumont, they

5

traveled to Kirbyville, and Jackson began talking about robbing a Brookshire Brothers Grocery Store in Kirbyville. Wright stated that he discouraged Jackson from robbing Brookshire Brothers because others had been caught in the past trying to rob that store.

According to Wright, during their travel to Kirbyville, Smith was in the backseat playing with a silver and black 9mm handgun that Jackson had previously sold him. Wright maintained that he asked Jackson to go to JFC so he could buy something to eat. When they arrived at JFC, Jackson remained in the car while he and Smith went into the restaurant. Wright contended that he was unaware that Smith was going to hold up JFC prior to their entering the restaurant. Wright explained that he went along with the robbery because Smith was yelling at him and the JFC employees, claiming that he was afraid that Smith would harm him. Wright stated that the reason he jumped into the pond after leaving JFC was because he thought Smith was shooting at him. When Smith began shooting, Wright dropped the cash box and money began to scatter. Wright was able to recover the cash box but jumped into the pond with it. Subsequently, Wright led the police to Smith's location in Houston.

III.   Analysis

A judgment of conviction that imposes a sentence of imprisonment is a "'final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010) (quoting 18 U.S.C. § 3582(b)); *see* 18 U.S.C. § 3582(c). Often referred to as "compassionate release," § 3582(c)(1)(A) embodies a rare exception to a conviction's finality. This statute gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment. The First Step Act of 2018 ("Act"), Pub. L. No. 115-391, 132 Stat. 5194, in part, amended 18 U.S.C. § 3582(c)(1)(A), which currently provides:

(A) the court, upon motion of the Director of the Bureau of Prisons [("BOP")], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a)[1] to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release." *See, e.g.*, *United States v. Escajeda*, 58 F.4th 184, 186 (5th Cir. 2023) ("We often refer to this as 'compassionate release' because courts generally use it for prisoners with severe medical exigencies or infirmities.").

Rather than define "extraordinary and compelling reasons," Congress elected to delegate its authority to the United States Sentencing Commission ("Commission"). *See* 28 U.S.C.

---

[1] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") provisions and policy statements; any pertinent policy statement of the United States Sentencing Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

§ 994(t) (directing the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *United States v. Jean*, 108 F.4th 275, 278 (5th Cir. 2024), *abrogated on other grounds by United States v. Austin*, 125 F.4th 688, 692 (5th Cir. 2025); *United States v. Jackson*, 27 F.4th 1088, 1090 (5th Cir. 2022); *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021); *United States v. Shkambi*, 993 F.3d 388, 392 (5th Cir. 2021). Although the Commission issued a policy statement prior to the passage of the Act that described the reasons that qualify as extraordinary and compelling, that policy statement referenced only those motions filed by the Director of the BOP—thus, the United States Court of Appeals for the Fifth Circuit and other courts held that it was inapplicable to motions filed by defendants on their own behalf. *See Jackson*, 27 F.4th at 1090; *Cooper*, 996 F.3d at 287-88; *Shkambi*, 993 F.3d at 392.

Effective November 1, 2023, the Commission—responding to, among other things, the Act—amended the Guidelines to extend the applicability of the policy statement set forth in U.S.S.G. § 1B1.13 to defendant-filed motions and to broaden the scope of what qualifies as "extraordinary and compelling" reasons potentially warranting compassionate release. *See* U.S.S.G. § 1B1.13. Section 1B1.13(b), as amended, identifies six categories of circumstances that may qualify as "extraordinary and compelling." *Id*. § 1B1.13(b). These categories are:

(1) the medical circumstances of the defendant;

(2) the age of the defendant;

(3) the family circumstances of the defendant;

(4) whether the defendant was a victim of abuse while in custody;

(5) other reasons similar in gravity to those previously described; and

8

(6) an unusually long sentence.

*Id*. § 1B1.13(b)(1)-(6).  The Fifth Circuit has clarified, however, that "prisoners have extraordinary and compelling reasons for relief 'only when they face some extraordinarily severe exigency, not foreseeable at the time of sentencing, and unique to the life of the prisoner.'" *Austin*, 125 F.4th at 692 (quoting *Escajeda*, 58 F.4th at 186).

As a result, a prisoner seeking compassionate release on his own motion must satisfy the following hurdles:

    (1)    the defendant must have exhausted his administrative remedies;

    (2)    "extraordinary and compelling reasons" must justify the reduction of his sentence or he must satisfy the requirements of § 3582(c)(1)(A)(ii);

    (3)    the reduction must be consistent with the Commission's applicable policy statements; and

    (4)    the defendant must convince the court to exercise its discretion to grant the motion after considering the § 3553(a) factors.

*Jackson*, 27 F.4th at 1089; *Shkambi*, 993 F.3d at 392; *accord United States v. Rollins*, 53 F.4th 353, 358 (5th Cir. 2022); *see Austin*, 125 F.4th at 692.

A.    Exhaustion of Administrative Remedies

Section 3582(c)(1)(A)'s plain language makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement.  18 U.S.C. § 3582(c)(1)(A); *United States v. Garrett*, 15 F.4th 335, 337 (5th Cir. 2021) ("[T]o file a proper motion for compassionate release in the district court, a prisoner must first exhaust the available administrative avenues."); *United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is

9

*not* jurisdictional, but that it *is* mandatory").  The exhaustion requirement applies whether the motion is styled as one for compassionate release or merely for a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A).  Accordingly, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Garrett*, 15 F.4th at 338 ("[A]n inmate has two routes by which he may exhaust his administrative remedies.  Both begin with 'requesting that the [BOP] bring a motion on the defendant's behalf.'" (quoting *Franco*, 973 F.3d at 467)).

Although this requirement is said to be mandatory, the Fifth Circuit has treated it as "a nonjurisdictional claim-processing rule."  *Franco*, 973 F.3d at 468.  "Mandatory but nonjurisdictional procedural filing requirements may be waived."  *United States v. McLean*, Nos. 21-40015, 21-40017, 2022 WL 44618, at *1 (5th Cir. Jan. 5, 2022); *see United States v. Harden*, No. 4:11-CR-127-SDJ, 2025 WL 562716, at *5 (E.D. Tex. Feb. 20, 2025).  Therefore, if the Government fails to "invoke § 3582(c)(1)(A)'s exhaustion requirement as a basis for denying relief," that argument is deemed waived.  *McLean*, 2022 WL 44618, at *1.

A defendant's motion for compassionate release must be based on the same circumstances as those raised in his request for release to the warden of the facility where he is housed.  *United States v. Dodd*, No. 4:13-CR-182-SDJ, 2020 WL 7396527, at *2 (E.D. Tex. Dec. 17, 2020) (stating that "[i]n order to exhaust her administrative remedies, a prisoner must first present to the BOP the same grounds warranting release that the prisoner urges in her motion"); *accord United States v. Thomas*, No. 4:19-CR-28-SDJ, 2023 WL 5279457, at *5 (E.D. Tex. Aug. 16, 2023) (citing *United States v. Mendoza-Garibay*, No. 4:13-CR-00281, 2023 WL 307459, at *1 (E.D.

Tex. Jan. 18, 2023)).  Hence, the facts asserted in an inmate's request to the warden and in his motion for compassionate release must be consistent.  *United States v. Scott*, No. CR 17-114, 2024 WL 2187849, at *2 (E.D. La. May 14, 2024); *see United States v. Gonzalez*, 849 F. App'x 116, 117 (5th Cir. 2021).  Further, "the exhaustion requirement applies to new arguments or grounds for compassionate release developed after an earlier request for compassionate release." *United States v. Cantu*, No. 7:17-cr-01046-2, 2022 WL 90853, at *1 (S.D. Tex. Jan. 5, 2022) (citing *United States v. Rivas*, 833 F. App'x 556, 558 (5th Cir. 2020)); *accord Mendoza-Garibay*, 2023 WL 307459, at *2.

Here, Smith appears to have exhausted his administrative remedies, at least in part.  On November 8, 2023, Smith's counsel, Amanda K. Rogers, submitted a request for compassionate release to Warden Chandler, the warden of the facility where he is housed.  The request is based on the length of Smith's sentence, his rehabilitation, and his young age at the time of his arrest, which she claimed to be 18, but he was in fact 19.  On November 11, 2024, Acting Warden J. Noel denied Smith's request, stating, "Your sentence is not considered to be [an] extraordinary or compelling reason for a RIS [reduction in sentence] under current BOP policy and does not currently warrant an early release through a RIS."  Smith previously submitted a Request for Compassionate Release/Reduction in Sentence to the RIS Coordinator on January 27, 2022, citing the length of his sentence in comparison to the sentence he would receive today as well as his rehabilitation.  The records provided to the court contain no response to this earlier request.  Thus, while Smith exhausted his administrative remedies with respect to his claims regarding the length of his sentence, his rehabilitation, and his youth at the time of his offenses, neither of his requests to the warden mentions sentence disparities between his sentence and those of his co-defendants.

Nonetheless, because the Government does not invoke § 3582(c)(1)(A)'s exhaustion requirement as a basis for denying relief, it has waived any nonjurisdictional, procedural filing requirements. *See McLean*, 2022 WL 44618, at *1 (holding that it is an abuse of discretion for the district court to deny a motion for compassionate release based on a purported failure to comply with § 3582(c)(1)(A)'s exhaustion requirement when the Government did not raise exhaustion). Although Smith appears to have complied with the exhaustion requirement before filing his Motion for Sentence Reduction, nothing in the motion indicates that extraordinary and compelling reasons exist to reduce his sentence or release him from confinement.

      B.      <u>Criteria for Release</u>

          1.      <u>Length of Sentence</u>

Smith contends that he should be granted a sentence reduction and released from custody because he received an unusually long sentence. He maintains that if he were sentenced today, he would receive a lesser sentence under current law, creating unwarranted sentencing disparities.

Section 1B1.13(b)(6) of the Guidelines provides:

> UNUSUALLY LONG SENTENCE.—If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

U.S.S.G. § 1B1.13(b)(6). A limitation on considering changes in the law is contained in 1B1.13(c) of the Guidelines, which provides:

> LIMITATION ON CHANGES IN LAW.—Except as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether

an extraordinary and compelling reason exists under this policy statement. However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under this policy statement, a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction.

U.S.S.G. § 1B1.13(c).

A review of Smith's PSR, prepared in April 2002, reveals that if sentenced today, he likely would receive a lesser sentence than the 461 months' imprisonment imposed in 2002.  In 2025, Smith would not be sentenced to 300 months' imprisonment for Brandishing a Firearm in Relation to a Crime of Violence as to Count V.  At the time of sentencing, the applicable statute specified a sentence of not less than 25 years because it was a second or subsequent conviction for violating 18 U.S.C. § 924(c), the first being Smith's conviction for discharging a firearm in Count III.  The first conviction, however, was not final at the time of sentencing because he was sentenced for both offenses on the same day—April 19, 2002.  Section 403(a) of the First Step Act, 132 Stat. at 5221-22, enacted on December 21, 2018, amended 18 U.S.C. § 924(c)(1)(C) to specify that the 25-year sentence applies only to a "violation of this subsection that occurs after a prior conviction under this subsection has become final."  Therefore, today, Smith would likely receive a sentence of 84 months' imprisonment as to Count V.  The applicable statute, 18 U.S.C. § 924(c)(1)(A)(ii), specifies a term of imprisonment of not less than 7 years if the firearm is brandished, resulting in a total term of 245 months' imprisonment.   Congress, however, explicitly made the change to 18 U.S.C. § 924(c)(1) non-retroactive.  The First Step Act provides:

APPLICABILITY TO PENDING CASES.—This section, and the amendments made by this section, shall apply to any offense that was committed before the date of enactment of this Act, *if a sentence for the offense has not been imposed as of such date of enactment.*

*Id.* § 403(b), 132 Stat. at 5222 (emphasis added).  Nonetheless, Smith could not be assured that the Government's charging decisions or trial positions would be the same today.  The evidence indicates, as set forth in the Indictment and the PSR, that Smith not merely brandished a firearm, but he carjacked a man at gunpoint to steal his Dodge vehicle at a convenience store in Beaumont later the same day he robbed the JFC restaurant in Kirbyville, as originally charged in Count IV of the Indictment.  Under current law, the applicable statute, 18 U.S.C. § 2119, specifies a term of imprisonment of up to 15 years (180 months) for that offense.  The Government, however, abandoned Count IV when Smith pleaded guilty to Count V of the Indictment.

In order to meet the requirements of the Unusually Long Sentence provision of U.S.S.G. § 1B1.13(b)(6), Smith must satisfy three requirements.  First, the defendant must be serving an unusually long sentence.  U.S.S.G. § 1B1.13(b)(6).  The sentence Smith received, 461 months, could be viewed as unusually long, but it was imposed after he engaged in a series of violent acts when he and others committed an armed robbery of a fried chicken restaurant in the small town of Kirbyville and then traveled to the City of Beaumont where he alone committed an armed carjacking at a convenience store later that day.  Second, the defendant must have served at least ten years of that sentence.  *Id.*  Smith has fulfilled this requirement.  Third, there must have been a change in the law that "produce[s] a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed."  *Id.*  This section explicitly excludes the consideration of non-retroactive changes "to the Guidelines Manual."  *Id.*  Here, the alleged sentence disparities in this case are based primarily on non-retroactive changes to the law.  In the Fifth Circuit, however, controlling precedent precludes the court's consideration of non-retroactive changes in *any* law, which accounts for most of the disparities in this case.  *See Austin*, 125 F.4th

14

at 692 ("A non-retroactive change in the law cannot constitute an extraordinary and compelling reason justifying sentence reduction under § 3582(c)(1)."); *Escajeda*, 58 F.4th at 187 (holding that "a prisoner cannot use § 3582(c) to challenge the legality or the duration of his sentence").

In a 2023 decision, the Fifth Circuit rejected a defendant's argument that he should receive a sentence reduction because the First Step Act reduced the statutory minimums applicable to his offenses. *See United States v. McMaryion*, No. 21-50450, 2023 WL 4118015, at *2 (5th Cir. June 22, 2023) (per curiam). The court pointed out that Congress did not make those reductions retroactive and went on to declare that "a prisoner may not leverage non-retroactive changes in criminal law to support a compassionate release motion, because such changes are neither extraordinary nor compelling." *Id*. The court noted that "in federal sentencing the *ordinary* practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." *Id*. (quoting *Dorsey v. United States*, 567 U.S. 260, 280 (2012)). The court elaborated that this ordinary practice reflects a "presumption against retroactive legislation" that is "deeply rooted in our jurisprudence" and that "embodies a legal doctrine centuries older than our Republic." *Id*. (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994)). The *McMaryion* court held: "We may not usurp the legislative prerogative and use 18 U.S.C. § 3582(c)(1) to create retroactivity that Congress did not." *Id*.

On July 15, 2024, however, the Fifth Circuit took the opposite approach in *United States v. Jean* when it upheld the release of a defendant for whom the district court found compassionate release to be warranted because his sentence, if imposed at the time of review, would have been nearly a decade shorter and he had exhibited extraordinary rehabilitation. 108 F.4th at 277. The defendant's sentence would have been shorter because he no longer would have been classified as

15

a career offender under U.S.S.G. § 4B1.1, which, among other things, would have affected his criminal history category. *Id.* at 279-80. Pointing to the Commission's amendments to the Guidelines that became effective on November 1, 2023, specifically U.S.S.G. § 1B1.13(b)(6), the court held that "after November 1, 2023, a non-retroactive change in the law may be considered in determining whether the defendant presents, as a whole, extraordinary and compelling reasons if: (1) the defendant has served at least ten years of the term of imprisonment; (2) the change in the law would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed; and (3) the defendant's individualized circumstances support compassionate release." *Jean*, 108 F.4th at 289-90. The *Jean* court explicitly held:

> It is within a district court's sound discretion to hold that non-retroactive changes in the law, in conjunction with other factors such as extraordinary rehabilitation, sufficiently support a motion for compassionate release. To be clear, it is also within a district court's sound discretion to hold, after fulsome review, that the same *do not* warrant compassionate release. For this court to hold otherwise would be to limit the discretion of the district courts, contrary to Supreme Court precedent and Congressional intent.

108 F.4th at 290.

In *Austin*, a different panel of the Fifth Circuit reached a contrary conclusion. In January 2023, the defendant filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1), arguing that a non-retroactive change in the law was an extraordinary and compelling reason to reduce his sentence. *Austin*, 125 F.4th at 690-91. At the time Austin pleaded guilty to conspiracy to distribute cocaine hydrochloride and cocaine base in violation of 21 U.S.C. § 846, and at the time of his sentencing in 2013, the mandatory minimum sentence for that offense was 20 years of imprisonment. *See* 21 U.S.C. § 841(b)(1)(A) (2010). The district court applied the mandatory minimum and sentenced Austin to 20 years of imprisonment. In 2018, Congress reduced the

16

mandatory minimum sentence for that offense to 15 years of imprisonment.  *See* First Step Act of 2018, Pub. L. No. 115-391, § 401(a)(2)(A), 132 Stat. 5194, 5220 (codified as amended at 21 U.S.C. § 841(b)(1)(A)).  Congress explicitly made this change non-retroactive, using identical language as that quoted above in reference to § 403(b) of the First Step Act, which made the change to the firearms statute at issue in this case, 18 U.S.C. § 924(c), non-retroactive.  *See id.* § 401(c), 132 Stat. at 5221.  Austin argued in his motion for compassionate release that despite Congress's decision to make § 401 non-retroactive, it should nonetheless apply retroactively to him.  *Austin*, 125 F.4th at 691.  He contended that the non-retroactive change set forth in § 401 was a "compelling and extraordinary" reason to reduce his sentence, because "if he were sentenced today, he would get the benefit of the First Step Act."  *Id.*

The Fifth Circuit rejected Austin's argument, holding that it was "squarely foreclosed under our rule of orderliness:  (A) we are bound by *United States v. Escajeda*, and (B) our later decision in *United States v. Jean* was wrong to say otherwise."  *Id.*  The court observed that Austin's case was "controlled by the binding holding in *United States v. Escajeda.*"  *Id.*  Citing the definitions of "extraordinary" and "compelling" set forth in *Escajeda*, the *Austin* court concluded that prisoners have extraordinary and compelling reasons for relief "only when they face some extraordinarily severe exigency, not foreseeable at the time of sentencing, and unique to the life of the prisoner."  *Id.* (quoting *Escajeda*, 58 F.4th at 186).  The court reasoned:

> A non-retroactive change in the law affects every prisoner previously sentenced under that provision in the exact same way.  And by its terms, a non-retroactive change in the law has zero effect on defendants already in prison.  Thus, a non-retroactive change in law is, by definition, neither an "extraordinarily severe exigency" nor "unique to the life of the prisoner."  *Ibid.*  Under a straightforward reading of *Escajeda*, a non-retroactive change in the law is not an extraordinary or compelling reason to reduce a prisoner's sentence.

17

*Id.* at 692. The panel noted that the Fifth Circuit had repeatedly followed *Escajeda* and reaffirmed this result. *See United States v. Cardenas*, No. 19-40425, 2024 WL 615542, at *2 (5th Cir. Feb. 14, 2024) (per curiam); *United States v. Elam*, No. 22-40373, 2023 WL 6518115, at *1-2 (5th Cir. Oct . 5, 2023) (per curiam); *McMaryion*, 2023 WL 4118015, at *2.

The *Austin* court recognized that § 1B1.13(b)(6) of the Guidelines, the provision at issue here, says that a non-retroactive change in the law may be considered in determining whether the defendant presents an extraordinary and compelling reason for a sentence reduction. 125 F.4th at 692. The court, however, stated:

> But that changes nothing. Just like any agency action, the Guidelines "must bow to the specific directives of Congress." *United States v. LaBonte*, 520 U.S. 751, 757 . . . (1997); *accord Stinson v. United States*, 508 U.S. 36, 38, 44-45 . . . (1993). Thus, the Sentencing Commission cannot make retroactive what Congress made non-retroactive. *See*, *e.g., McMaryion*, 2023 WL 4118015, at *2. And it certainly cannot do so through an interpretation of "extraordinary and compelling" that conflicts with the plain meaning of those terms. *See ibid*. Moreover, the Commission "does not have the authority to amend the statute we construed" in *Escajeda* and its progeny. *Neal v. United States*, 516 U.S. 284, 290 . . . (1996); *accord United States v. Koons*, 850 F.3d 973, 979 (8th Cir. 2017).

*Id*. The *Austin* panel proceeded to declare that *Jean* "was wrongly decided and does not control. Under our rule of orderliness, when one panel decision disregards an earlier panel decision, we are duty-bound to follow the earlier one." *Id*. at 692-93 (citing *Lucas v. Lumpkin*, 125 F.4th 639, 641 (5th Cir. 2025); *Nivelo Cardenas v. Garland*, 70 F.4th 232, 242 n.7 (5th Cir. 2023)). The *Austin* court further observed that *Jean* was distinguishable. *Id*. at 693. In *Jean*, the change in the law resulted from a new judicial interpretation of § 4B1.1 of the Guidelines, whereas in *Austin*, the change in the law resulted from a new statute that explicitly said it was non-retroactive, the First Step Act § 401(c), 132 Stat. at 5211. *Id*. Similarly, in the case at bar, the change in the law at issue resulted from a new statute that explicitly stated it was non-retroactive—First Step Act

18

§ 403(b), 132 Stat. at 5221-22. In any event, the *Austin* decision makes clear that "[a] non-retroactive change in the law cannot constitute an extraordinary and compelling reason justifying sentence reduction under § 3582." 125 F.4th at 693.

Similarly, the Courts of Appeals for the Third, Sixth, and Seventh Circuits have held that when Congress makes a change in the law non-retroactive, such change cannot serve as an extraordinary and compelling reason warranting compassionate release. *See United States v. Bricker*, No. 24-3286, 2025 WL 1166016, at *17 (6th Cir. Apr. 22, 2025); *United States v. Black*, 131 F.4th 542, 546 (7th Cir. 2025); *United States v. Rutherford*, 120 F.4th 360, 377-78 (3d Cir. 2024). Other district courts within the Fifth Circuit have recognized that non-retroactive changes in sentencing law cannot be used to reduce a defendant's sentence merely because, in the judge's estimation, the defendant received an unusually long sentence that now represents a gross disparity from the sentence the court would likely impose today. *See United States v. Torres*, No. H-93-210-1, 2025 WL 1654590, at *2, 5 (S.D. Tex. June 11, 2025) (declining to reduce life sentence imposed on defendant for engaging in a drug trafficking and money-laundering conspiracy based on non-retroactive changes to the law); *see also United States v. Santivanez*, No. SA-98-CR-304(2)-OLG, 2025 WL 1703429, at *4 (W.D. Tex. Apr. 29, 2025), *adopted by* 2025 WL 1700054 (W.D. Tex. June 17, 2025) (rejecting sentence reduction motion filed by a 21-year-old participant in a conspiracy to firebomb the home of a rival gang member that resulted in the death of one of the occupants who was sentenced to life imprisonment plus an additional 30-year mandatory consecutive sentence); *United States v. Matute-Carcamo,* No. H-19-494-2, 2025 WL 1677950, at *3 (S.D. Tex. June 13, 2025) (recognizing that a "non-retroactive change in the law cannot constitute an extraordinary and compelling reason justifying sentence reduction under

§ 3582(c)(1)"); *United States v. Guillory*, No. 2:02-CR-20062-01, 2025 WL 910518, at *3 (W.D. La. Mar. 24, 2025) ("Compassionate release claims arising from non-retroactive changes in the law are not cognizable under 18 U.S.C. § 3582(c)(1)(A) despite the addition of subsection (b)(6) to the Sentencing Commission's policy statement."); *United States v. Warren*, No. 2:21-cr-33-KS-MTP, 2025 WL 465320, at *4 (S.D. Miss. Feb. 11, 2025).

Therefore, under controlling Fifth Circuit law, the length of Smith's sentence imposed in 2002 versus the length of the sentence he might receive today cannot be considered in determining whether compassionate release or a sentence reduction is warranted under 18 U.S.C. § 3582(c)(1)(A).

### 2.    Rehabilitation

Smith asserts that his "remarkable rehabilitation" post-sentence, as evidenced by his mental health recovery, completion of over 415 hours of educational programming, working in a variety of jobs in prison, serving as a Step Down Mentor in the Mental Health Step Down Program, and becoming a certified paralegal in 2012 justifies a reduction in his sentence. Regarding rehabilitation of the defendant, the Guidelines recognize: "Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement. However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." U.S.S.G. § 1B1.13(d); *accord United States v. Martinez*, No. 23-50418, 2024 WL 658952, at *1 (5th Cir. Feb. 16, 2024) ("Even if [the defendant] were reformed, his rehabilitation efforts alone are not an extraordinary and compelling reason for release."); *United States v. Handlon*, No. 23-50386,

2024 WL 111787, at *1 (5th Cir. Jan. 10, 2024) (holding that the defendant's "rehabilitation
efforts alone are not an extraordinary and compelling reason for his release").

Hence, while the court may consider rehabilitation efforts, "[r]ehabilitation of the
defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C.
§ 994(t); *accord United States v. Rios*, No. 24-673-cr, 2025 WL 841862, at *2 (2d Cir. Mar. 18,
2025); *United States v. Black*, 131 F.4th 542, 544 (7th Cir. 2025); *see United States v. Cordoba*,
No. 24010599, 2025 WL 799354, at *1 (5th Cir. Mar. 13, 2025); *Shkambi*, 993 F.3d at 392;
*United States v. Hudec*, No. CR 4:91-1-1, 2020 WL 4925675, at *5 (S.D. Tex. Aug. 19, 2020)
("While the Court is permitted to consider post-sentencing rehabilitation in determining whether
to grant an eligible defendant a sentence reduction, it is not authorized to grant a reduction based
upon post-sentencing rehabilitation alone."). In fact, "[m]aking good use of one's time in prison
is not uncommon, and indeed is expected." *United States v. Blanco*, No. 16-CR-408 (CS), 2021
WL 706981, at *2 (S.D.N.Y. Feb. 22, 2021) (quoting *United States v. Alvarez*, No. 89-CR-229,
2020 WL 4904586, at *7 (E.D.N.Y. Aug. 20, 2020)); *see United States v. Alimehmeti*, No. 16-
CR-398 (PAE), 2024 WL 4880197, at *8 (S.D.N.Y. Nov. 25, 2024) (recognizing that some
amount of rehabilitative effort is expected of inmates and holding that completion of educational
courses and doing productive work while incarcerated did not justify early release). Further,
"making good use of one's time in prison and regretting one's actions are not grounds for sentence
reductions under the First Step Act." *United States v. Polnitz*, No. 17-cr-201-pp, 2020 WL
1139836, at *2 (E.D. Wis. Mar. 9, 2020). In any event, in *United States v. Comb*, the court
found a similar BOP log listing a defendant's participation in rehabilitative programs to be "wholly
inadequate" for concluding that the defendant's rehabilitation was "beyond or out of the common

order." No. H-13-0575-06, 2025 WL 240954, at *3 (S.D. Tex. Jan. 17, 2025) (quoting *Escajeda*, 58 F.4th at 186), *aff'd*, 2025 WL 603881 (5th Cir. Feb. 25, 2025).

A review of the BOP records Smith attached to his motion reflects that his efforts at rehabilitation, while commendable, fall far short of "remarkable." The records show that Smith is 44 years old, is a high school graduate, is a Medical Care Level 2 inmate (stable, chronic care), recovered from COVID-19 in 2020, has no medical restrictions, is eligible for regular duty work assignments, and is cleared for food service. Smith is a Mental Health Care Level 2 inmate, attaining that status in 2023 after previously being classified as a Mental Health Care Level 3 inmate. The BOP's mental health classifications reflect that Mental Health Care Level 2 pertains to inmates who require (1) "[r]outine outpatient mental health care on an ongoing basis"; and/or (2) "[b]rief, crisis-oriented mental health care of significant intensity; e.g., placement on suicide watch or behavioral status." Smith's disciplinary record shows that he has been sanctioned numerous times since 2003 and has lost good conduct time credit and various privileges for offenses such as lying or falsifying statements, being insolent to staff, tattooing or self-mutilating, refusing to obey an order (2x), fighting with another person (2x), refusing drug/alcohol test, interfering with security devices, and making a sexual proposal/threat. In 2006 and again in 2014, Smith was charged with assaulting with serious injury, but he was found not responsible by his treating psychiatrist. In 2016, he was charged with refusing to obey an order. The hearing officer found him responsible but not competent.

Smith has experienced serious mental health problems, including schizophrenic disorder (paranoid type), depressive type psychosis, antisocial personality disorder, other personality disorder, and psychosocial and environment problems while incarcerated. He suffered from

malnutrition and unspecified nutritional deficiencies because he "quit eating from fear of something[s] growing inside from food" and other paranoid food related ideas from 2009 through 2016. Smith's behavior improved markedly when he began receiving intensive mental health care treatment in a structured program. His medical records reflect that his schizophrenia is currently deemed to be in remission as well as his depressive type psychosis and personality disorders. Smith is now prescribed daily doses of Aripiprazole, an antipsychotic medication used to treat schizophrenia, bipolar, and major depressive disorder. He is also prescribed daily doses of Benztropine, a medication used to treat involuntary movement side effects of certain antipsychotics. Smith participates in the Mental Health Step Down Program, which according to Smith's counsel, "is a specialized program offered at FMC Fort Worth that 'operates as a modified therapeutic community (MTC) using cognitive behavioral treatment, peer support, and skills training while ensuring participants received appropriate medication and have the opportunity to build a positive relationship with the psychiatrist.'" While Smith has done well while participating in the Mental Health Step Down Program, the court has little assurance that he would maintain his treatment protocol outside this specialized therapeutic community overseen by psychiatrists, psychologists, and other mental health professionals.

As set forth in his motion, Smith's early life was marked with trauma and instability following his father's death when he was 9 years old. His mother "never finished school and worked minimum-wage jobs." According to his motion, "[h]e struggled in school, got caught up in the juvenile justice system, and ended up in a military boot camp called Delta 3." Ultimately, Smith was convicted of multiple violent felonies in the case at bar. His mother does not appear to have been very involved in his upbringing, and she was not present at his sentencing in 2002.

Smith contends that he has a "robust" release plan which consists of living with his mother in Houston, seeking assistance with medication management and therapy at Southeast Community Service Center, and utilizing Goodwill Houston's reentry assistance for job training and placement.  While these plans sound appropriate, they appear to be little more than aspirational. There is no assurance that Smith will continue on his mental health treatment plan or comply with the conditions of release, which would require action on his part to seek treatment, to obtain medication, to comply with medication regimens, to secure employment, and to work on a regular basis outside of the protective therapeutic environment of a BOP Medical Center.

While Smith contends that his mother and his siblings have offered to help him work toward finding employment and attending medical appointments, these assurances sound hollow. His mother, Dorothy Smith ("Dorothy"), submitted a letter in support of her son.  In it, she states:

> In April of this year [2024], I was hospitalized due to kidney failure and placed on dialysis.  I have been a heart patient since 1999 after my first heart attack.  I currently go to the doctor every six months to get the veins in my legs checked and I have a lot of surgeries to open up the veins in my legs.  Generally, they are day surgeries, and I am able to come home after but on April 5th, I went in for surgery on my leg and the doctor wasn't able to insert the balloon because I have blockages in both of my legs.  It was also discovered that my kidneys were shutting down and I have been on dialysis ever since.  Currently, my two daughters, Shadow and Sheila Smith, help take care of me, but they both have jobs and children, so it is hard for them.

Hence, instead of an individual who would be able to assist Smith in seeking mental health treatment and obtaining a job, Dorothy appears to be an elderly lady in poor health who is in need of a caregiver herself.  In fact, she asserts, "If Joseph were released, he would come and live with me to help take care of me.  He would be with me all the time and help me around the house, help me take my medications, and be a support person for me with my health."  His sister, Shadow Smith ("Shadow"), similarly states that her mother is sick and that "because he [Smith] would live

with her, he would be the best person to take care of our mom." She explains that she owns her own business and single-handedly runs it, adding that she has children of her own that she takes cares of and lives an hour away from her mother so it is difficult for her to get there to see her. Shadow envisions that Smith would be the primary caretaker for their mother and that she could help him get certified as a Certified Nursing Assistant so he could take care of their mother and earn money as well. Shadow, likewise, sees Smith as a potential caregiver for their mother rather than as an individual who needs her help to remain compliant with his treatment program and obtain outside employment. His older sister, Sheila Smith ("Sheila") also explains her mother's health concerns which include kidney failure and heart problems, noting that "it was incredibly hard on me and my sister because we don't live close to our mom and we both work and have children." Although Sheila states that she will be there to support Smith when he gets out and to help him in any way she can, the thrust of her letter is that "[i]f my brother were able to come home, he would be our mom's primary caregiver and would live with her so she could have constant care."

Under the circumstances, there is no reason to believe that Dorothy could insure that Smith would comply with any conditions of release that could reasonably be imposed on him, just as she was unable to prevent him from using drugs and committing increasingly serious crimes when he lived with her as a juvenile prior to his arrest for his offenses of conviction. His sisters are otherwise occupied and offer little solace that they could guarantee Smith's compliance with his future mental health treatment plans and employment obligations. It is difficult to conceive of a less suitable caregiver for his elderly, ill mother than Smith, a diagnosed schizophrenic with an array of other mental health problems, which may or may not remain in remission, along with

numerous prior misdemeanor and felony convictions, some of which were violent and involved a firearm.  As the probation officer commented in Smith's PSR:

> He is quick to accept violence as the tool to use to get things he wants.  He used a gun in two robberies in the instant offenses of conviction, and he assaulted a man in jail in an argument over a television.

The probation officer further noted that Smith "maintains he never kept a job longer than five months because '[t]hey did not pay enough and they required too much labor work.'"  The court is concerned that outside the therapeutic community at FMC Fort Worth, Smith will revert to his prior use of violence and drugs along with his indolent lifestyle.

Although the court hopes that Smith will continue on the path to rehabilitation, the court is of the opinion that neither the length of his sentence nor his rehabilitation efforts merit his release at this time.

### 3.    Catch-All Provision

Smith also seeks a sentence reduction/compassionate release due to the allegedly disparate sentences received by his co-defendants and his young age at the time of his offenses of conviction.   The current policy statement acknowledges that other reasons not specifically enumerated in the policy statement may provide a basis for compassionate release. *See* U.S.S.G. § 1B1.13(b)(5).

> (5)    Other Reasons.—The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

U.S.S.G. § 1B1.13(b)(5).   Smith contends that when these additional factors are considered in conjunction with the length of his sentence and his rehabilitation, a reduction in his sentence is warranted.

a.    <u>Sentence Disparities Among Co-defendants</u>

Smith complains about alleged disparities between the sentence he received (461 months) and those of Jackson (156 months) and Wright (36 months).  These defendants, however, were not similarly situated and did not play the same roles in the offenses of conviction.  Smith is the only individual who was in possession of a firearm.  He pointed a gun at the JFC restaurant employee and demanded money.  He also fired three gunshots at the employees who followed the robbers outside.  Most significantly, Smith is the only defendant who committed an independent felony by effecting a carjacking at gunpoint at a convenience store in Beaumont in which Jackson and Wright had no involvement.  If he had not committed the additional offense, Smith would have been sentenced to 161 months' imprisonment (41 months on Counts I and II (served concurrently) and 120 months on Count III).  This cannot be considered unduly disparate to the 156 months Jackson received in view of the fact that Jackson remained in the car throughout the robbery.  The subsequent reduction in Jackson's sentence to 104 months in 2008 was due to factors unrelated to his offenses of conviction when others provided assistance to the Government on Jackson's behalf with regard to a different matter.  Wright pleaded guilty to Count II of the Indictment and cooperated with the Government, resulting in a sentence of 36 months with respect to that count, similar to Jackson, as compared to the 41 months on Count II received by Smith.  He was not convicted of Counts I or III.  According to the PSR, Wright led the police to Smith's location in Houston.  In addition, Wright claimed that he was not aware that Smith was going to rob the JFC before they entered the store.  He contended that he went along with the robbery because Smith was yelling at him and the employees and that he was afraid that Smith would harm him.  Wright further stated that he jumped into the pond after leaving the restaurant because he thought Smith

27

was shooting at him.  In any event, "[t]here is nothing 'extraordinary' or 'compelling' about a sentence disparity that results from a co-defendant's decision to plead guilty and assist the government," as Wright did, to warrant a reduction in sentence.  *United States v. Hunter*, 12 F.4th 555, 572 (6th Cir. 2021).

As the Government points out, "disparities between the sentences of coconspirators can exist for valid reasons, such as differences in criminal histories, the offenses of conviction, or one coconspirator's decision to plead guilty and cooperate with the government." *Id.* (quoting *United States v. Conatser*, 514 F.3d 508, 522 (6th Cir. 2008)); *accord United States v. Fernandez*, 104 F.4th 420, 428 (2d Cir. 2024).  Hence, "[i]t is not 'extraordinary' (indeed, it should be expected) that a defendant who proceeds to trial and is convicted receives a longer sentence than his co-defendants who plead guilty to different crimes, accept responsibility, and assist the government by cooperating." *Fernandez*, 104 F.4th at 428.  As the Sixth Circuit observed in *Hunter*, "our criminal justice system 'is for the most part a system of pleas, not a system of trials,' and this 'often results in individuals who accept a plea bargain receiving shorter sentences than other individuals who are less morally culpable but take a chance and go to trial.'" 12 F.4th at 572 (quoting *Missouri v. Frye*, 566 U.S. 134, 143-44 (2012)).  Hence, Smith's assertions based on alleged sentencing disparities between his sentence and those of his codefendants are without merit and provide no basis for relief.

### b.    Youthfulness at Time of Offense

Smith further alleges that his young age at the time of the offenses provides another factor for the court to consider in ruling on his motion for sentence reduction.  Although Smith was not a minor, he was 19 years old at the time he committed his offenses of conviction.  Smith contends

that an amendment to the Guidelines on April 30, 2024, which took effect on November 1, 2024, expressly allows a downward departure due to the defendant's youthfulness at the time of the offense. This amendment, Amendment 829, provides in part:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

U.S.S.G. § 5H1.1 Age (Policy Statement). Smith claims that, at age 19, he was "exactly the type of offender the new amendment, and the extensive social science and neuroscience on which it was based, had in mind."

Amendment 829, the Youthful Offender Amendment, however, has not been given retroactive effect. *See* U.S.S.G. § 1B1.10(d) (listing amendments that have been given retroactive effect); *Matute-Carcamo*, 2025 WL 1677950, at *3. Thus, it "cannot be considered in the 'extraordinary and compelling reason' calculus." *Matute-Carcamo*, 2025 WL 1677950, at *3. Indeed, even the Guidelines preclude the consideration of a non-retroactive amendment to the Guidelines Manual for the purpose of determining whether an extraordinary and compelling reason exists under the revised policy statement. *See* U.S.S.G. § 1B1.13(b)(6), (c). As recently reaffirmed by the Fifth Circuit, "[a] non-retroactive change in the law cannot constitute an extraordinary and compelling reason justifying sentence reduction under § 3582(c)(1)." *Austin*, 125 F.4th at 693; *accord Matute-Carcamo*, 2025 WL 1677950, at *3. Moreover, Smith's youth when he committed his offenses of conviction was a known fact that existed at the time of his sentencing, and "the Court may not construe such a fact as 'extraordinary and compelling.'"

29

*United States v. Cook*, No. 10-cr-20667-1, 2023 WL 4565461, at * 3 (E.D. Mich. July 17, 2023) (citing *Hunter*, 12 F.4th at 570). Thus, Smith "cannot look to Amendment 829 for purposes of U.S.S.G. § 1B1.13(5)." *Matute-Carcamo*, 2025 WL 1677950, at *4.

In any event, Smith's youth was raised at the sentencing hearing. His lawyer pointed out that Smith was the youngest of the three defendants and referred to him as a "kid" who had "ruined his life." Smith's counsel argued to Judge Schell:

> At this point you are his only last hope of ever one day saying to himself, saying to you and to the rest of the word or community that he made a mistake and he's prepared to live the rest of his life. He still has many, many years ahead of him; and only you can decide how long he will have to go out there some day and say, "I'm sorry for what I did."

At sentencing, Smith also mentioned his young age, acknowledging that he was "just a kid" and remarked, "I'm still young, and I don't just know what I just put myself into. But I just – you know, like young kids, we usually play around with things. We don't know what's happening." He continued, "I just ask for mercy and just to, you know, just give me another chance – only thing I can say is just I'm sorry. I'm sorry. And please have mercy on me. I'm sorry."

Judge Schell stated that he had looked at the Guidelines and remarked that "under 5H1.12 lack of guidance as a youth and a disadvantaged upbringing are not relevant grounds for imposing a sentence outside the applicable guideline range; so, I cannot depart based on that." Nevertheless, as to the only counts of the Indictment on which the court had any discretion, Counts I and II, as the punishment on Counts III and V was statutorily mandated, Judge Schell sentenced Smith to 41 months' imprisonment, the bottom of the guidelines range, rather than to 51 months at the top of range, as recommended by Probation. While Judge Schell acknowledged Smith's youth, he observed:

> But you're old enough to know that what you did is wrong; and at the time you did it, you were old enough to know that. I don't think at 20 young men have mature judgment. I understand that. But at 10 or less, even younger, you know that you don't point guns at people and you don't shoot guns toward people. And that is what really has affected the length of your sentence here.

Hence, as in *United States v. Ratcliff*, Smith's "age at the time of the offenses was previously factored in to the sentence imposed, and it does not constitute an extraordinary and compelling reason to reduce his sentence at this juncture." No. 12-51, 2025 WL 1707214, at *2 (E.D. La. June 18, 2025). Therefore, neither Smith's age nor the disparities between the three defendants' sentences, when considered in connection with the length of Smith's sentence and his efforts at rehabilitation, provide a basis for relief or merit a reduction in his sentence.

C.    Section 3553(a) Factors

The court further finds that compassionate release is not merited in light of the applicable factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *United States v. Chavez*, No. 23-50684, 2024 WL 940263, at *1 (5th Cir. Mar. 5, 2024); *Rollins*, 53 F.4th at 358-59; *United States v. Shorter*, 850 F. App'x 327, 328 (5th Cir. 2021) (finding that the court did not abuse its discretion in denying compassionate release after balancing the § 3553(a) factors); *United States v. Keys*, 846 F. App'x 275, 276 (5th Cir. 2021); *Shkambi*, 993 F.3d at 392; *United States v. Thompson*, 984 F.3d 431, 435 n.11 (5th Cir. 2021) (collecting cases); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). Smith's offenses of conviction stem from a series of felony offenses he committed with the use of a firearm in two different towns more than 50 miles apart over the course of a day.

Looking at the totality of the circumstances, it is apparent that Smith's actions placed multiple people in fear of losing their lives or sustaining serious bodily injuries in his efforts to obtain money and a vehicle at gunpoint.  He evinced no regard for the lives or well-being of the persons he affected during his crime spree.  In addition to the nature and circumstances of his offenses of conviction, Smith was no stranger to the criminal justice system and had accumulated a significant criminal history before turning age 20.  His criminal history begins at age 15 and includes prior convictions for possession of a controlled substance (cocaine) (age 15), theft (age 15), unauthorized use of a motor vehicle (age 16), possession of a controlled substance (cocaine) (age 16), and possession of marijuana (age 19).  As the Government observed at sentencing, "Mr. Smith has been quite busy to be so young."  Smith was placed on deferred adjudication probation for the first four offenses, but he failed to comply with the conditions, and the charges were all adjudicated at which time he was placed on probation for an additional 12 months.  In *United States v. Boyd*, the defendant had a similar history of violating probation.  No. 3:17-CR-37-TAV-DCP-4, 2021 WL 5094903, at *3 (E.D. Tenn. Nov. 2, 2021).  The court found that "defendant's history of violating probation calls into question his respect for the law and whether he would abide by his conditions of supervised release in this case if his motion for compassionate release were granted."  *Id*.  This court has the same concerns in the case at bar.  Smith also has a history of poly-substance abuse beginning at age 12 and continuing up to his commission of his offenses of conviction, which includes the habitual use of marijuana (6 or 7 cigar-size cigarettes per day), Xanax (4 pills twice per week), and codeine elixir (½ pint per day).  In short, Smith's "criminal history and conduct reflect an unabated propensity for crime."  *United States v. Padilla*, No. H-14-174-1, 2021 WL 1517855, at *5 (S.D. Tex. Apr. 16, 2021).

"[C]ompassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *Chambliss*, 948 F.3d at 693; *see Rollins*, 53 F.4th at 358-60 (upholding the denial of compassionate release of the defendant, who suffered from a "dire" medical situation stemming from a gunshot wound that required the amputation of his right leg and left him paralyzed, but deferring to the district court's balancing of the § 3553(a) factors, including the defendant's "history, the serious nature of his offense, and the danger his release would pose to the community at-large"); *United States v. Gharib*, No. 21-40779, 2022 WL 1565352, at *1 (5th Cir. May 18, 2022). Where, as here, a prisoner has engaged in "severe" criminal conduct and has a criminal history, the district court has discretion to deny compassionate release under the circumstances. *Chambliss*, 948 F.3d at 693-94; *accord Rollins*, 53 F.4th at 358-60; *Gharib*, 2022 WL 1565352, at *1 (refusing to consider the defendant's contention that extraordinary and compelling reasons justified compassionate release due to the defendant's no longer being subject to the career offender enhancement when the district court found that the § 3553(a) factors outweighed granting relief); *Keys*, 846 F. App'x at 276 (rejecting the defendant's argument that the court gave too much weight to his criminal history and finding that "a mere disagreement with the court's balancing of the § 3553(a) factors . . . is not a sufficient ground for reversal"). In *United States v. McKinney*, the court denied relief to a prisoner who had end-stage renal failure and had a portion of his foot amputated despite the Government's concession that the defendant had established an "extraordinary and compelling reason" within the meaning of § 3582(c)(1)(A)(i), finding that "granting compassionate release would not comport with the factors enumerated in Section 3553(a)." No. 19-00394-03, 2023 WL 2993020, at *1, 3 (W.D. La. Apr. 18, 2023). The court pointed to McKinney's extensive

33

criminal history that included several drug convictions, firearm convictions, and simple battery. *Id*. at *3. The *McKinney* court noted that the inmate had repeatedly failed to comply with previous terms of probation and parole and clearly lacked respect for the law. *Id*. The court concluded that a reduction in sentence would not equate to a "just punishment" under § 3553(a)(2)(A). The court expounded: "It is this Court's belief that a reduced sentence simply would not reflect the seriousness of the offense, would not promote respect for the law, would not afford adequate deterrence to criminal conduct, and would not protect the public from further crimes of this Defendant." *Id*. The same analysis applies here. In view of the nature and circumstances of his offenses of conviction, his criminal history, his mental health problems, and his history of substance abuse, the court cannot conclude that Smith's early release from prison would afford adequate deterrence or protect the public, as he continues to pose a danger to other persons and to the community as a whole. In fact, it is unclear whether Smith would have access to or avail himself of adequate medical and mental health treatment if he were released, as he has requested, to the home of his mother in Houston. As Smith's records indicate, his medical and mental health needs are being met by a variety of specialists and providers at the Federal Medical Center in Fort Worth. On balance, as in *McKinney*, the § 3553(a) factors do not support Smith's release.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he has behaved when released in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)). Here, Smith's track record is similarly a poor one. In this instance, there is no reason to believe that Smith would not revert to his violent behavior involving the use of firearms and other criminal acts as

well as his use of illegal drugs if released from prison at this time. *See United States v. Wymer*, 573 F. Supp. 3d 1208, 1212 (N.D. Ohio 2021). Smith committed serious offenses that justified his sentence, and the circumstances he now identifies that are based primarily on non-retroactive changes in the law, do not render that sentence unjust or inequitable. *See United States v. Lewis*, No. 17-CR-28-FPG, 2021 WL 4519795, at *3 (W.D.N.Y. Oct. 4, 2021).

IV.    Conclusion

In sum, Smith has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. The 461-month sentence of imprisonment imposed upon Smith for his violent offenses comports with the 18 U.S.C. § 3553(a) factors, and he has adduced no extraordinary and compelling reasons to lessen his sentence or justify his release from prison at this time. Neither the length of his sentence, his rehabilitation, his youth at the time of his offenses, nor the lesser sentences of his codefendants merit a sentence reduction or compassionate release under these circumstances.

Accordingly, Smith's Motion for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A) (#248) is DENIED.

SIGNED at Beaumont, Texas, this 18th day of July, 2025.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE